445 S.E.2d 253

**Jerry SHREWSBERRY, doing business as Image Keepers, an Individual Plaintiff Below, Appellee,**

v.

**AZTEC SALES & SERVICE CO., INC., a Corporation; Aztec Industries, Inc., a Corporation, Defendants Below, Appellants,**

and

**William Najar, an Individual, Defendant Below.**

No. 21779.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 19, 1994.

Decided May 31, 1994.

---

Fred A. Jesser, III, Jesser & Harrington, Fayetteville, for appellants.

Kevin B. Burgess, Hamilton, Burgess, Young, Tissue & Pollard, Oak Hill, for appellee.

PER CURIAM:

This action is before this Court upon an appeal from the August 10, 1992, order of the Circuit Court of Fayette County, West Virginia, which denied the appellant, Aztec Sales & Service, Inc. and Aztec Industries, Inc.'s motion for a new trial and the appellee, Jerry Shrewsberry, d/b/a Image Keeper's motion for a new trial on the issues of punitive damages and damages for annoyance and inconvenience, following a jury verdict against the appellant in the amount of $75,-500, on June 23, 1992. On appeal, the appellant asks that this Court reverse the ruling of the circuit court and grant the appellant a new trial. This Court has before it the petition for appeal, all matters of record and the briefs and arguments of counsel. For the reasons stated below, the judgment of the circuit court is affirmed.

I

Image Keepers is a commercial floor cleaning business owned and operated by the appellee, Jerry Shrewsberry (hereinafter "appellee") and his wife, Mary. In August, 1988, the appellee entered into a contract with the Kroger Company under which the appellee agreed to furnish specified interior maintenance and janitor service for the Kroger store located in Gassaway, West Virginia, at the rate of $400 per week.[1] In January, 1991, the appellee entered into a similar contract with the Kroger store at the Kanawha Mall in Charleston, West Virginia, at the rate of $650 per week.[2] Either contract could be cancelled upon thirty days written notice by either party for any reason.[3]

On December 29, 1989, the appellee purchased from the appellant, Aztec Sales & Service, Inc. and Aztec Industries, Inc. (hereinafter "appellant"), at its factory in Pennsylvania, several machines for his floor cleaning business. The appellee paid $1,100 for a "Liquidator" and $5,095 for a "Sidewinder." The Liquidator lays down the chemical solution used to strip layers of wax from floors

---

1. The appellee began Image Keepers sometime in 1988 and the Kroger store in Gassaway was his first contract.

2. Floor maintenance and janitorial services provided by commercial floor-cleaning businesses like Mr. Shrewsberry's are performed when the stores are closed or when they are the least busy. Consequently, it was agreed that the appellant would perform these services at the Gassaway store between the hours of 11:00 p.m. and 9:00 a.m. and between the hours of 10:00 p.m. and 8:00 a.m. at the Kanawha Mall.

3. In addition to this "cancellation" provision, both contracts contained a "termination" provision, which stated, in relevant part: "If the Contractor fails to perform the work with reasonable diligence and efficiency in Kroger's judgment, Kroger may terminate the contract by giving the Contractor thirty days written notice[.]"

while the Sidewinder then agitates the wax from the floor. The appellee paid for these machines in full at the time of purchase.

Though the appellee had originally intended to purchase only the two machines described above, the appellant also sold the appellee a third machine called a "Guzzler," which removes the old wax after it has been agitated. The Guzzler was listed at $1,995. However, the appellant sold it to the appellee for $1,400 because, according to the appellee, the party who had originally ordered the machine failed to follow through with the purchase. The appellee paid $500 down on the Guzzler and agreed, in writing, to pay the $900 balance in ninety days. The writing did not create a security interest in the Guzzler or in any of the other equipment the appellee purchased.

Upon his return to West Virginia, the appellee examined the Guzzler more closely and found it to be used, though, according to the appellee, the appellant had represented to him that it was "off the production line" and, therefore, new. Thus, the appellee disputed the remaining $900 due on the machine.

When the appellee refused to pay the balance due on the Guzzler, the appellant hired William Najar[4] of Princeton, West Virginia, to seize the Sidewinder from the appellee, even though that machine had been paid for in full and was worth five times that of the Guzzler.[5] Between 2:00 and 3:00 a.m., on February 11, 1991, Mr. Najar successfully seized the Sidewinder from one of the appellee's employees at the Kroger store located in the Fayette Square Shopping Center in Oak Hill, West Virginia.[6] Though the appellee asked Mr. Najar to return his machine, Mr. Najar refused and instead, packed it up and sent it to the appellant's factory in Pennsylvania. Similarly, the appellant refused to return the Sidewinder to the appellee until the balance on the Guzzler was paid in full.

At the time the appellant had the appellee's Sidewinder seized, in February, 1991, the floors at the Gassaway and Kanawha Mall Kroger stores were due to be stripped.[7] By letter of March 9, 1991, Robert Hamner, the manager of the Gassaway store, informed the appellee that his floor maintenance contract would be terminated if the unsatisfactory conditions of the sales floor continued to exist. The appellee explained to Mr. Hamner that his Sidewinder had been seized, which was why the conditions of the sales floor had deteriorated.[8] On March 22, 1991, the appellee's contract with the Gassaway store was terminated.

Similarly, the appellee's contract with the Kanawha Mall store was terminated because the appellee was without the use of the Sidewinder and was, therefore, unable to properly strip the floors. When the appellee procured the contract with the Kanawha Mall store, only one month before his Sidewinder was seized by the appellant, it was with the understanding that the floors would be maintained in good condition.[9] The appellee's contract with the Kanawha Mall store was terminated on March 16, 1991.[10]

---

4. Mr. Najar is also involved in the cleaning and maintenance of large retail businesses.

5. At Mr. Najar's insistence, the appellee sent to him a document, entitled "Aztec Repossession Services" which purportedly gave "the bearer the authority to reclaim the equipment listed below.... Recovery of the below listed equipment will facilitate closeing [sic] this account."

6. Before purchasing the floor cleaning machines from the appellants in 1989, the appellee had rented similar machines from Mr. Najar, for which the appellee owed Mr. Najar $100. Initially, the appellee believed Mr. Najar seized the Sidewinder as a means of recouping that $100 debt.

7. The Sidewinder is used one to two times per year, depending upon the daily maintenance of the floor.

8. The appellee attempted to rent another Sidewinder or a machine comparable to it, but was unsuccessful. He further attempted to scrub the floor with a buffer, but that machine could not do the job properly.

9. The floor maintenance contractor which previously held the Kanawha Mall contract did not sufficiently maintain the condition of the sales floor. Consequently, that contract was terminated.

10. The record reflects that the appellee had lost two other contracts with the Lewisburg Kroger and the South Hills Kroger. However, the appellee does not contend that these two contracts were lost due to the appellant's unlawful seizure of his Sidewinder. The appellee presently has floor maintenance contracts with four Kroger stores in West Virginia. In order to fulfill these

Though the Circuit Court of Fayette County granted the appellee's motion for immediate possession of the Sidewinder, after a hearing on the matter,[11] the appellant failed to comply. Instead, the appellant subsequently asserted that it had a valid security interest in the seized equipment.[12] When the appellant was unable to produce a security agreement, the circuit court entered judgment for the appellee [13] upon the issue of the appellant's liability for the wrongful taking of the Sidewinder.[14]

Following a jury trial on the issue of damages, the jury found the actual damages suffered by the appellee, as a result of the wrongful taking of his Sidewinder, to be $75,500. It is that verdict from which the appellant now appeals.[15]

## II

■ The appellant's only assignment of error is that the circuit court erred in allowing the admission of appellee's expert testimony and related exhibits regarding lost business profits. At trial, the appellee's expert, accountant David Epperly, testified as to the lost profits suffered by Image Keepers

as a result of the unlawful seizure of the appellee's Sidewinder and the resulting loss of the two floor maintenance contracts. In calculating the lost business profits, Mr. Epperly used methods generally accepted in the accounting community. He took into account the ages of both the appellee and his wife and the general operating attributes of the business itself.

Mr. Epperly conservatively assumed that the weekly rates for each contract would have remained constant throughout the loss progression. Ultimately, the increasing expense values would absorb the profit margin, totally eliminating it, in approximately thirteen years. Thus, once the contracts became unprofitable, they would be terminated.[16]

The appellant strongly objected to the admission of Mr. Epperly's testimony and the accompanying documents which were introduced as exhibits on the basis that his calculations were speculative and based on erroneous assumptions. The appellant specifically refers to the fact that Mr. Epperly did not consider that the contracts were "open-ended," that is, terminable by either party at any

contracts, the appellee was eventually forced to purchase another Sidewinder from the appellant via a third party. By purchasing another Sidewinder, the appellee was able to properly strip the floors of these other stores.

11. William Najar was originally a co-defendant in this action. However, the jury found that he was not liable. Though notice of the hearing on the appellee's motion for immediate possession was given to all parties, the appellant did not appear either in person or by counsel.

12. The circuit court issued a stay of its order granting the appellee immediate possession of the Sidewinder based on an altered copy of the appellant's agreement with the appellee regarding payment on the Guzzler. Added to the appellant's copy of the agreement, below the parties' signatures, was language purportedly creating a security interest in all three machines. When the circuit court ordered the appellant to produce the original of the document, the appellant refused.

13. The circuit court's ruling as to liability applied to the appellant, Aztec Sales and Service, Inc., and Aztec Industries, Inc., and not to William Najar. One of the issues at trial concerned Mr. Najar's liability. As we noted earlier, the jury

found that Mr. Najar was not liable for the damages suffered by the appellee.

14. Eventually, the appellant sent to the appellee a Sidewinder which the appellant claimed was the same one it seized. However, the Sidewinder it sent to the appellee had a different serial number and had many more hours logged on it. The appellant finally conceded that it had "lost" the appellee's Sidewinder, but offered to send him a new one. The "new" machine was actually used and was, therefore, rejected by the appellee.

15. In its petition for appeal, the appellant represented to this Court that it seized the appellee's Sidewinder because the unpaid $900 balance was owed on all three machines. However, the record clearly reflects that the Sidewinder was paid for in full and that the trial court determined, as a matter of law, that the appellant wrongfully seized that machine.

16. The high-range present value relative to the appellee's losses assumed that Image Keepers would have retained the two contracts throughout the loss progression. The low-range present value was calculated by applying statistical adjustments relative to the interim death probabilities of the appellee and his wife and small business failure rates in West Virginia.

time [17] or that the appellee had previously lost two other Kroger contracts. The appellant further objected to Mr. Epperly's failure to consider statistical data concerning the "average life" of a floor maintenance contract with a Kroger's store.

■ In syllabus point 6 of *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991), this Court stated that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." After considering the appellant's objection to the evidence of lost profits, the trial court judge acknowledged that absolute certainty in proving and calculating such damages cannot be achieved. Thus, he concluded that Mr. Epperly's testimony and the related exhibits affect the weight and credibility of the evidence, rather than the admissibility. We cannot say that this determination was clearly wrong. After Mr. Epperly's testimony, counsel for the appellant had ample opportunity to cross-examine him on his calculations and the assumptions on which those figures were based. The jury was then able to consider Mr. Epperly's testimony for what it was worth. Furthermore, the appellant did not introduce any expert evidence on the issue of lost profits, though it certainly could have. Therefore, we hold that the trial court's admission of Mr. Epperly's expert testimony, and the related exhibits, was within its sound discretion and not clearly wrong.

### III ·

■ The appellee raises a cross-assignment of error in which he argues that the trial court should have allowed him to pursue his claims for punitive damages, on the basis that the appellant intentionally converted his personal property. In syllabus point 4 of *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982), we stated that:

'Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong.' Syllabus Point 1, *O'Brien v. Snodgrass*, 123 W.Va. 483, 16 S.E.2d 621 (1941).

In refusing to allow the appellee to pursue claims of punitive damages, the trial court apparently concluded that the facts of this case do not demonstrate the type of wanton, wilful or malicious conduct which traditionally authorizes the right to punitive damages. Based upon our review of the record, we cannot say that the trial court erred in this decision. Accordingly, for the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

---

**17.** See note 3, *supra*.